**Jack Carroll WELCH, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 08–94–00114–CR.

Court of Appeals of Texas,
El Paso.

Aug. 17, 1995.

Rehearing Overruled Sept. 20, 1995.

**260**

Rhett Hoestenbach, Odessa, for appellant.

John W. Smith, Dist. Atty., Odessa, for State.

Before LARSEN, McCLURE and CHEW, JJ.

### OPINION

McCLURE, Justice.

Jack Carroll Welch appeals his conviction for the offense of murder. A jury found Appellant guilty and assessed his punishment at 12 years' imprisonment in the Texas Department of Criminal Justice, Institutional Division. We affirm.

### INEFFECTIVE ASSISTANCE OF COUNSEL

In Point of Error No. One, Appellant contends that he was denied the effective assistance of counsel at the punishment phase because his trial attorney failed to file an application for probation. As Appellant's complaint concerns an alleged error of counsel at the punishment phase of his bifurcated noncapital trial, we apply the test announced in *Ex parte Duffy*, 607 S.W.2d 507 (Tex.Crim. App.1980), rather than the two-pronged standard set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Craig v. State*, 825 S.W.2d 128, 130 (Tex.Crim.App.1992); *Ex parte Cruz*, 739

S.W.2d 53, 58 (Tex.Crim.App.1987). Under the *Duffy* test, we must determine: (1) whether counsel was reasonably likely to render effective assistance, and (2) whether counsel reasonably rendered effective assistance. *Craig,* 825 S.W.2d at 130. The sufficiency of an attorney's assistance is gauged by the totality of the representation of the accused. *Ex parte Cruz,* 739 S.W.2d at 58. The burden is on the appellant to demonstrate ineffective assistance of counsel by a preponderance of the evidence. *Moore v. State,* 694 S.W.2d 528, 531 (Tex.Crim.App. 1985); *Jaile v. State,* 836 S.W.2d 680, 683, 686–87 (Tex.App.—El Paso 1992, no pet.). Furthermore, allegations of ineffective assistance will be sustained only if they are firmly founded in the record. *Valdes–Fuerte v. State,* 892 S.W.2d 103, 110 (Tex.App.—San Antonio 1994, no pet. h.); *Jaile,* 836 S.W.2d at 686–87.

 Appellant's claim is without merit because the record does not affirmatively establish that he was eligible for probation from the jury. Appellant testified at trial and admitted that he was, or in the past had been, on probation for burglary of a motor vehicle. *See* TEX.PENAL CODE ANN. § 30.04 (Vernon 1994). That offense was a third-degree felony prior to the time of Appellant's trial. *See* Acts 1973, 63rd Leg., R.S., ch. 399 § 1, 1973 TEX.GEN.LAWS 883, 927, *amended by* Acts 1993, 73rd Leg., R.S., ch. 900, § 1.01, 1993 TEX.GEN.LAWS 3586, 3634 [former TEX.PENAL CODE § 30.04(c) ]. Since there is no evidence properly in the record to show that Appellant received deferred adjudication probation for that offense, it appears that he had a prior felony conviction at the time of trial.[1] Consequently, he would not be eligible for probation from the jury, even though his sentence had been suspended. TEX.CODE CRIM.PROC.ANN. art. 42.12, § 4(e) (Vernon Supp.1995); *Earhart v. State,* 823 S.W.2d 607, 623 (Tex.Crim.App.1991), *vacated on other grounds,* —— U.S. ——, 113 S.Ct. 3026, 125 L.Ed.2d 715 (1993) (a defendant who is under a suspended sentence is ineligible for probation from a jury on a subsequent conviction). Because the record before us does not affirmatively establish Appellant's eligibility for probation from the jury, he has failed to show that counsel rendered ineffective assistance by not filing a sworn motion for probation. Point of Error No. One is overruled.

## LESSER–INCLUDED OFFENSE

 In Point of Error No. Two, Appellant contends that the trial court erred in denying his requested instruction on the lesser-included offense of voluntary manslaughter. In determining whether Appellant is entitled to a charge on a lesser-included offense, we must consider all of the evidence introduced at trial, whether produced by the State or by the defendant. *Banda v. State,* 890 S.W.2d 42, 69 (Tex.Crim.App.1994); *Dowden v. State,* 758 S.W.2d 264, 269 (Tex. Crim.App.1988). We apply the two-pronged "*Royster* test"[2] as recently modified in *Rousseau v. State,* 855 S.W.2d 666, 672 (Tex.Crim. App.), *cert. denied,* —— U.S. ——, 114 S.Ct. 313, 126 L.Ed.2d 260 (1993). First, the lesser-included offense must be included within the proof necessary to establish the offense charged. *Rousseau,* 855 S.W.2d at 673. Second, there must be some evidence in the record that would permit a jury rationally to find that if the defendant is guilty, he is guilty only of the lesser-included offense. *Rousseau,* 855 S.W.2d at 673. The credibility of the evidence and whether it conflicts with other evidence or is controverted may

---

1. Appellant has attached to his reply brief a certified copy of an order of the 358th District Court, dated February 4, 1992, discharging a person named Jack Carroll Welch, Jr. from deferred adjudication probation for the offense of burglary of a vehicle. This document was not introduced at trial. Consequently, it is not part of the appellate record and may not be considered by us in resolving this point of error. *See Young v. State,* 552 S.W.2d 441, 443 (Tex.Crim. App.1977) (articles attached to the briefs are not properly before the appellate court as evidence); *Martin v. State,* 492 S.W.2d 471, 472 (Tex.Crim.

App.1973) (docket sheet attached to brief did not appear in the record, and therefore, could not be considered by appellate court); *Jones v. State,* 478 S.W.2d 937, 938 n. 1 (Tex.Crim.App.1972) (exhibit attached to appellant's brief which did not appear in record could not be considered by appellate court).

2. *Royster v. State,* 622 S.W.2d 442, 446 (Tex. Crim.App. [Panel Op.] *1981*) (opin. on rehearing).

not be considered in determining whether an instruction on a lesser-included offense should be given. *Banda*, 890 S.W.2d at 60; *Marras v. State*, 741 S.W.2d 395, 405 (Tex. Crim.App.1987). If evidence from any source raises the issue and a jury charge on the issue is properly requested, the issue must be submitted to the jury. *Dowden*, 758 S.W.2d at 269.

■■■ At the time of Appellant's trial, Section 19.04(a) of the Texas Penal Code provided, in part, that: "A person commits [voluntary manslaughter] if he causes the death of an individual under circumstances that would constitute murder under Section 19.02 of this code, except that he caused the death under the immediate influence of sudden passion arising from an adequate cause." Acts 1973, 63rd Leg., R.S., ch. 399, § 1, 1973 TEX.GEN.LAWS 883, 913, *amended by* Acts 1973, 63rd Leg., R.S., ch. 426, art. 2, § 1, 1973 TEX.GEN.LAWS 1123, 1124 and Acts 1993, 73rd Leg., R.S., ch. 900, § 1.01, 1993 TEX. GEN.LAWS 3586, 3614 [former TEX.PENAL CODE § 19.04(a) ].[3] Therefore, voluntary manslaughter is not a lesser-included offense of murder unless there is some evidence of sudden passion in the case. *State v. Lee*, 818 S.W.2d 778, 782 (Tex.Crim.App.1991); *Acosta v. State*, 742 S.W.2d 287, 288 (Tex.Crim. App.1986). "Sudden passion" means passion directly caused by and arising out of provocation by the individual killed or another acting in concert with the person killed which passion arises at the time of the offense and is not solely the result of former provocation. TEX.PENAL CODE ANN. § 19.02(a)(2) (Vernon 1994) [former TEX.PENAL CODE § 19.04(b) ]. "Adequate cause" means cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection. TEX.PENAL CODE ANN. § 19.02(a)(1) (Vernon 1994) [former TEX.PE-NAL CODE § 19.04(c) ]. Not all testimony of

anger or fear entitles a defendant to a voluntary manslaughter charge. *Gonzales v. State*, 717 S.W.2d 355, 357 (Tex.Crim.App. 1986); *Ybarra v. State*, 890 S.W.2d 98, 109 (Tex.App.—San Antonio 1994, pet. ref'd); *Nance v. State*, 807 S.W.2d 855, 860 (Tex. App.—Corpus Christi 1991, pet. ref'd). For a claim of fear or anger to rise to the level of sudden passion, the defendant's mind must be rendered incapable of cool reflection. *See Gonzales*, 717 S.W.2d at 357.

■■ The evidence showed that the victim, Jerry Stamps (Stamps), and his brother, Greg Stamps (Greg), came to the trailer home of Appellant and Mary Carrasco (Carrasco) at approximately midnight on the night of the shooting. They were accompanied by a woman that Carrasco did not know. Carrasco had formerly lived with Stamps for two or three years, and in her written statement she referred to him as her common-law husband. Carrasco said that when Stamps became drunk late at night, as he was on this night,[4] he would often come to visit her. She first let Greg into the trailer and Stamps and the woman soon followed. Carrasco maintained that she did not invite Stamps or the woman inside. The woman, who was also drunk, went into the restroom and began vomiting. Carrasco said that she repeatedly asked Stamps to leave, but he would not. She then awakened Appellant and told him that Greg and Jerry Stamps were there with a sick woman and they would not leave. Appellant soon came out of the bedroom. According to Carrasco, Stamps followed Appellant into the kitchen. She heard Appellant tell him to stay back and to leave several times, and then she heard Appellant fire a "warning shot." While she was taking her young son back to bed, she heard the sound of two or three gunshots. Carrasco stated in her written statement that Stamps told them that he did not want to start any trouble. She testified, however, that she did not be-

3. Voluntary manslaughter is no longer defined as a separate offense. Instead, it is a defensive issue which may be raised at the punishment stage of a murder trial. *See* TEX.PENAL CODE ANN § 19.02(a)(1), (2) and § 19.02(d) (Vernon 1994) (the defendant may, at the punishment stage of a trial, raise the issue as to whether he caused the death under the immediate influence of sudden

passion arising from an adequate cause; if the defendant proves the issue in the affirmative by a preponderance of the evidence, the offense is a felony of the second degree).

4. The autopsy revealed that Stamps' blood alcohol level was .22 at the time of his death.

lieve him. She also said in her written statement that Stamps had no weapons, he did not make any threats, and he did not lunge or approach Appellant in a threatening manner.

Appellant testified that the victim had in the past threatened to beat him up. He also knew that Stamps had assaulted Carrasco on a prior occasion when they lived together. Since Appellant had been living with Carrasco, Stamps had broken some windows in their home approximately six months before the shooting, and he occasionally would speed by their home in his vehicle. When Carrasco awakened Appellant and told him that Stamps and Greg were there with a sick woman and they would not leave, he pulled on his pants and got his pistol. He put in the clip and racked a round into the chamber, and left the bedroom after putting the gun in his pocket. He then went into the livingroom and saw Stamps sitting on the couch. Appellant said that all of them argued for fifteen to thirty minutes. Appellant told Stamps to leave several times, but he refused. At some point before the shooting, Greg went outside with the drunken woman.

Appellant went into the kitchen and Stamps followed. Carrasco soon joined them. Stamps leaned on the bar for support while Carrasco argued with him. Appellant kept telling Stamps to leave. Stamps then told Appellant that he and Carrasco would still be together if it were not for him. Appellant pulled the handgun out of his pocket so that Stamps could see it, and while asking him to leave, fired a warning shot at the floor. He told Carrasco, who was standing in front of Stamps, to move because Appellant was going to shoot Stamps if he did not leave. Carrasco moved out of the way, and Appellant told Stamps that he would shoot him in the leg if he did not leave. Stamps began walking towards Appellant, so he fired two shots at Stamps' leg, but missed. Appellant said that he was "confused" and "scared," so he raised the gun and fired it twice. The bullets struck Stamps in the stomach and chest, killing him. Appellant admitted that Stamps did not have any weapons or threaten him, but he believed that Stamps and Greg were there to "beat [him]

up or something." When describing Stamps' appearance, Appellant said that he was "pretty drunk" and did not seem "very happy."

Appellant contends that Stamps' "unauthorized entry" into his home, his refusal to leave, and his unprovoked attack upon Appellant caused him to experience the kind of terror which rendered his mind incapable of cool reflection. The record does not support Appellant's claims. Appellant's testimony that he became "scared" and "confused" when Stamps continued to walk toward him is insufficient to show that Appellant's fear at the time of the shooting rose to a level of terror sufficient to render him incapable of cool reflection. *See Gonzales,* 717 S.W.2d at 357–58; *Lopez v. State,* 716 S.W.2d 127, 129 (Tex.App.—El Paso 1986, pet. ref'd). To the contrary, the evidence shows, even when taken in the light most favorable to Appellant, that Appellant responded to Stamps' "unauthorized entry" into his home by arming himself and going out to talk to Stamps and the others for an extended period of time. Further, Appellant's own testimony shows that he made the decision to shoot Stamps before he ever took a step towards Appellant. All of this conduct shows preparation and "cool reflection."

■ Appellant's claim that Stamps' "unprovoked attacked" upon him raises the issue of voluntary manslaughter is likewise without merit. Unlike the case relied upon by Appellant, *Phillips v. State,* 700 S.W.2d 18, 20 (Tex.App.—Amarillo 1985, pet. ref'd), there is no evidence here that Stamps attacked Appellant or that he did so without warning or provocation. To the contrary, Stamps walked towards Appellant only after Appellant had pulled out a gun and threatened to shoot him, and had fired a warning shot at the floor.

Finally, Appellant's argument that we may infer from the circumstances that he was terrorized by Stamp's conduct is without merit. The Court of Criminal Appeals has refused a similar invitation to imply material evidence into the record, and we will likewise decline to do so. *See Gonzales,* 717 S.W.2d at 357. In the absence of evidence that Appellant acted in sudden passion, the issue

of voluntary manslaughter was not raised. Point of Error No. Two is overruled.

### SELF–DEFENSE

In Point of Error No. Three, Appellant asserts that the trial court erred in denying his requested instruction on self-defense. Where the evidence raises the issue of self-defense, the accused is entitled to have an instruction on self-defense submitted to the jury. *Hayes v. State,* 728 S.W.2d 804, 807 (Tex.Crim.App.1987); *Dyson v. State,* 672 S.W.2d 460, 463 (Tex.Crim.App.1984). Because Appellant used deadly force in killing Stamps, he must meet the requirements of both Section 9.31 and Section 9.32 of the Penal Code before he is entitled to an instruction on self-defense. Section 9.32 provides that the use of deadly force is justified in self-defense only when three conditions are present: (1) the defendant would have been justified in using force under Section 9.31; (2) a reasonable person in the defendant's position would not have retreated; and (3) the use of deadly force was reasonably believed to be immediately necessary to protect the defendant against another's use or attempted use of unlawful deadly force, or to prevent the imminent commission of specified violent crimes. TEX.PENAL CODE ANN. § 9.32 (Vernon 1994); *Werner v. State,* 711 S.W.2d 639, 644 (Tex.Crim.App.1986). In the absence of evidence of use or attempted use of deadly force by the victim, the Section 9.32 defense is not available and the accused is not entitled to a jury instruction on self-defense. *Id.* at 644.

Even if Appellant's testimony is accepted as true, self-defense is not raised. Appellant speculated that Stamps had come to his home to "beat [him] up or something," but he admitted that Stamps did not threaten to kill or harm him. In fact, Stamps told Appellant and Carrasco that he did not want any trouble. Appellant said that Stamps did not have any weapons, and he did not make any motions or gestures as if he were reaching for a weapon. There is no evidence that Stamps attempted to take the weapon away from Appellant. Significantly, Appellant made the decision to use deadly force before Stamps ever took a step towards him.

Stamps began to walk towards Appellant only *after* Appellant had threatened to shoot him and had fired the gun once. In summary, there is no evidence to show that Appellant could have reasonably believed that deadly force was immediately necessary to protect himself against Stamps' use or attempted use of unlawful deadly force. *See Werner,* 711 S.W.2d at 644–45 (deadly force self-defense not raised where deceased said "You're just going to have to shoot me," made shrugging motion and, with a crazed look on his face, took a step toward defendant; there was no evidence that deceased used or attempted to use deadly force); *Holmes v. State,* 830 S.W.2d 263, 265 (Tex. App.—Texarkana 1992, no pet.) (deadly force self-defense not raised where defendant said the deceased took a step towards him like he was going to take a baseball bat away from him, but there was no evidence that deceased made any verbal threats or attempted to take the bat). Point of Error No. Three is overruled.

### MARITAL PRIVILEGE

In Point of Error Four, Appellant alleges that the trial court erred in compelling Appellant's wife, Mary Helen Carrasco, to testify after she invoked her privilege under TEX.R.CRIM.EVID. 504(2)(a). Under Rule 104(a), preliminary questions concerning the admissibility of evidence and the existence of a privilege shall be determined by the trial court. TEX.R.CRIM.EVID. 104(a); *McVickers v. State,* 874 S.W.2d 662, 664 (Tex. Crim.App.1993). The trial court is afforded broad discretion in the determination of such questions, and its ruling will not be reversed absent an abuse of discretion. *McVickers,* 874 S.W.2d at 664; *Werner,* 711 S.W.2d at 643.

The spouse of the accused has a privilege not to be called as a witness for the State. TEX.R.CRIM.EVID. 504(2)(a). However, this privilege does not exist as to matters occurring prior to the marriage. TEX. R.CRIM.EVID. 504(2)(a). Because Appellant and Carrasco were not ceremonially married

at the time of the instant offense,[5] Appellant was required to prove that a common-law marriage existed in order for the marital privilege to apply. *See Quinonez–Saa v. State*, 860 S.W.2d 704, 709 (Tex.App.—Houston [1st Dist.] 1993, pet. ref'd). In order to prove the existence of a common-law marriage, one must prove: (1) the parties entered into an express or implied agreement to become husband and wife; (2) they cohabitated in Texas pursuant to that agreement; and (3) they there represented to the general public that they were married. *Tompkins v. State*, 774 S.W.2d 195, 208 (Tex.Crim.App. 1987), *aff'd*, 490 U.S. 754, 109 S.Ct. 2180, 104 L.Ed.2d 834 (1989); *Quinonez–Saa*, 860 S.W.2d at 710; Tex.Fam.Code Ann. § 1.91(a)(2) (Vernon 1993). The existence of such a marriage is a fact question with the burden of proof on the person seeking to establish the existence of the marriage by a preponderance of the evidence. *Hightower v. State*, 629 S.W.2d 920 (Tex.Crim.App. 1981); *Weaver v. State*, 855 S.W.2d 116, 120 (Tex.App.—Houston [14th Dist.] 1993, no pet.).

 At the time of the offense, Appellant and Carrasco had been living together for ten months. Carrasco testified that she and Appellant considered themselves to be husband and wife, and they told people they were married. She said that she had used the last name "Welch" on several occasions, including a "lay-a-way."[6] She also claimed that she had told the deputies who questioned her about the instant offense that Appellant was her common-law husband. Appellant did not call these deputies to testify about the statements. Welch's testimony was contradicted by her own written statement which she gave to law enforcement authorities in connection with this case. She explained that she signed her written statement as Mary Helen Carrasco, and not Mary Helen Welch, because "it wasn't legal then." Despite her testimony that she had told the

deputies that Appellant was her common-law husband, she referred in her written statement to the victim, Jerry Stamps, as her "common law husband." She never referred to Appellant as her husband in the statement. Instead, she called him her "old man." When asked about her reference to Stamps as her common-law husband, she denied the marriage and said that she did not use his last name and they did not tell other people that they were married. However, Carrasco admitted that she had named her son Jimmy Leon Stamps. Appellant did not testify for the purpose of establishing the existence of the common-law marriage. The trial court concluded that they did not have a common-law marriage at the time of the offense and required Carrasco to testify against Appellant.

■ The evidence is undisputed that Appellant and Carrasco lived together at the time of the offense. However, mere cohabitation is insufficient to establish a common-law marriage. *Tompkins*, 774 S.W.2d at 209; *Quinonez–Saa*, 860 S.W.2d at 710. Carrasco's testimony concerning the other two elements of a common-law marriage is contradicted by her own written statement. Consequently, the trial court could have disbelieved her testimony in that regard. Because Appellant did not carry his burden of establishing the existence of the common-law marriage by a preponderance of the evidence, the trial court did not abuse its discretion in requiring Carrasco to testify. *See McDuffie v. State*, 854 S.W.2d 195, 213 (Tex.App.—Beaumont 1993, pet. ref'd); *Reece v. State*, 772 S.W.2d 198, 201–02 (Tex.App.—Houston [14th Dist.] 1989, no pet.). Point of Error No. Four is overruled.

Having overruled all of Appellant's points of error, the judgment of the trial court is affirmed.

---

**5.** They were ceremonially married three days before trial began.

**6.** This Court does not place anything beyond evidentiary significance on a woman's decision to use, or not to use, a man's name. Many married women never adopt their husband's sur-name. Some unmarried women continue to use a former spouse's surname, or choose to adopt a man's name although not married to him. To place any greater legal significance on an individual's choice of name is something we specifically disapprove.