TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-99-00486-CR







Jose Alcaraz, (1) Appellant



v.



The State of Texas, Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 167TH JUDICIAL DISTRICT


NO. 990742, HONORABLE THOMAS BLACKWELL, JUDGE PRESIDING






 A jury found Jose Alcaraz guilty of engaging in organized criminal activity. He
was convicted of conspiring to steal more than $200,000 worth of large vehicles for use in
transporting illegal aliens between Eagle Pass and Austin. The district court assessed sentence
at fifty years in prison. On appeal, Alcaraz complains that no evidence corroborated the testimony
of the accomplice witnesses and that the district court erred by deciding that Anselma Martinez
could not claim spousal privilege from testifying against Alcaraz. We will affirm the conviction.

 Because the standard of review for the sufficiency challenge requires that we
discount the testimony of accomplice witnesses, we will not spend much time discussing the
details of their extensive testimony. The accomplices consistently described the crime ring. The
thieves stole late model Chevrolet or GMC pickup trucks and Suburbans by popping the front
passenger door lock with a screwdriver, breaking into the steering column, and hot-wiring the
vehicle. They delivered the trucks in Austin to an apartment and a duplex in the St. John's
neighborhood and to an apartment complex off South Lamar. They were usually paid as much
as $300. Many of the accomplices were told the trucks were to be used to transport illegal aliens
between Eagle Pass and Austin. The vehicles were taken because of their passenger capacity and
their ability to drive off-road to evade or delay capture by law enforcement authorities. Some of
the men were offered pay ten times more than their car sale fee if they would drive passengers
from Eagle Pass to Austin. Some of the men sold cars to appellant, whom some of them knew
as "Chino," but others never met him. Some of the accomplices testified that they heard appellant
talking in jail about not confessing, and asking others not to do so either.

 By his first point of error, appellant argues that the court erred by denying his
alleged common-law wife Martinez's claim of the privilege against testifying. Texas recognizes
common-law or informal marriages if a man and woman agree to be married and after the
agreement they live together in Texas as husband and wife while telling others that they are
married. Tex. Fam. Code Ann. § 2.401(a)(2) (West 1998). A person under eighteen years of
age may not be a party to an informal marriage. Id. § 2.401(c)(1). Such marriages require that
the parties agree they are currently married, not that they will marry sometime in the future. 
Colburn v. State, 966 S.W.2d 511, 515 (Tex. Crim. App. 1998). The person seeking to establish
the existence of the marriage must prove its existence by a preponderance of the evidence. Welch
v. State, 908 S.W.2d 258, 265 (Tex. App.--El Paso 1995, no pet.).

 We review the denial of husband-wife privilege for an abuse of discretion. See
Carmona v. State, 947 S.W.2d 661, 664 (Tex. App.--Austin 1997, no pet.). We can reverse a
decision only if the trial court applied an erroneous legal standard, or when no reasonable view
of the record could support the trial court's conclusion under the correct law and the facts viewed
in the light most favorable to its legal conclusion. Id. We will sustain the trial court's decision
if it is correct on any theory of law applicable to the case. Romero v. State, 800 S.W.2d 539, 543
(Tex. Crim. App. 1990). This principle holds true even when the trial judge gives the wrong
reason for his decision, and is especially true with regard to admission of evidence. Id. at 543-44.

 Martinez did not want to testify against appellant. She knew that appellant had
lived with Anna Hernandez before meeting her and had two children, ages seven and five, with
Hernandez. Martinez testified that she was nineteen at the time of trial on May 20, 1999, and that
their son was two years old. She testified that she had lived with appellant since 1996, but that
she stayed with her mother about half the time. She said her name was on the lease of the
apartment where she lived with appellant, and she planned to live with him when he was free. 
She visited him in jail around forty times. (2) Martinez said she considered appellant her husband
and that they held themselves out to be married. She admitted that, when she learned after
appellant's arrest that he had been seeing another woman while they were living together, she did
not care about him any more; she nevertheless testified that she still considered him her husband. 
She also testified, however, that they had "talked about getting married." Recalling her
conversations with a detective during the investigation of the crimes charged in this prosecution,
she said, "First I said he was my husband and when all this started going deeper in I said he was
my boyfriend." When asked why she changed her statements, she replied, "Because we weren't
married."

 The court stated that appellant could not have been married to Martinez because
his relationship with Hernandez constituted a marriage. Though appellant protested that there was
no evidence of a previous marriage, the court denied the privilege "since he had children by
another woman prior to this and he was then unable to have made a lawful common law marriage
with this woman." Because there was no evidence that any marriage to Hernandez was dissolved,
the court held appellant could not have married Martinez. 

 Even agreeing with appellant that the record lacks proof that he was married to
Hernandez before his relationship with Martinez, we conclude that the district court did not abuse
its discretion by denying the spousal privilege to Martinez. Her testimony regarding the
relationship was equivocal. Though she claimed appellant was her husband, she also talked of
their plans to "get married" and told an investigator that appellant was her boyfriend, not her
husband, because they "weren't married." Her cohabitation with appellant was part-time before
his arrest. Further, Martinez could not invoke the privilege for events occurring before her
eighteenth birthday because she was legally unable to declare an informal marriage then. See Tex.
Fam. Code Ann. § 2.401(c) (age eighteen minimum for informal marriage) and Tex. R. Evid.
504(b)(4)(B) (excluding events preceding marriage from spousal privilege). Based on Martinez's
testimony, their relationship began before Martinez was eighteen--Martinez testified in May 1999
that she was nineteen, that the relationship began in 1996, and that their child was two years old. 
Appellant had been in jail for fourteen months before trial, leaving a fairly small period between
her eighteenth birthday and March 1998 during which the privilege potentially could have applied. 
Because Martinez's statements supporting her claim of the privilege were equivocal (and because
as a matter of law she could not make a claim regarding a large period of their relationship), we
conclude the trial court did not abuse its discretion by denying the privilege.

 Appellant also complains that insufficient evidence corroborates the accomplice
testimony. Appellant was convicted of conspiring to commit motor vehicle theft. To prove the
conspiracy, the State had to show appellant agreed with one or more persons that they or one or
more of them would engage in conduct that would constitute the offense and that he and one or
more of them performed an overt act in pursuance of the agreement. See Tex. Penal Code Ann.
§§ 71.01(b) & 71.02(a)(1) (West Supp. 2000). An agreement constituting conspiring to commit
the crime may be inferred from the acts of the parties. See id. § 71.01(b). The jury was also
charged that he could be held responsible for illegal actions of others as a party if, acting with
intent to promote or assist the commission of the offense, he solicited, encouraged, directed,
aided, or attempted to aid the others to commit the offenses. See id. §§ 7.01 & 7.02(a)(2) (West
1994). "A conviction cannot be had upon the testimony of an accomplice unless corroborated by
other evidence tending to connect the defendant with the offense committed; and the corroboration
is not sufficient if it merely shows the commission of the offense." Tex. Code Crim. Proc. Ann.
art. 38.14 (West 1979). We eliminate from consideration the accomplices' testimony and examine
the remaining evidence to ascertain whether it independently tends to connect appellant to the
commission of the offense. See Leal v. State, 782 S.W.2d 844, 851 (Tex. Crim. App. 1989). 
The corroborating evidence need not directly connect appellant to the crime or be sufficient by
itself to establish guilt. Cathey v. State, 992 S.W.2d 460, 462 (Tex. Crim. App. 1999); see also
Hernandez v. State, 939 S.W.2d 173, 176 (Tex. Crim. App. 1997).

 The testimony of several law enforcement agents corroborated the accomplice
witnesses' testimony.

 Customs Service agent Dean Fitz said that his agency saw Cesar Labra crossing the
border and meeting with several people, including Antonio Jaimes of Mexico's Jaimes family. 
He identified 150 Pierce Street in Eagle Pass as a staging area for the aliens. He described finding
a stolen Suburban at that address containing two illegal aliens.

 Border Patrol agent Neil Marley testified that the false name one of the accomplice
witnesses gave upon his arrest included the name Jaimes, indicating he was probably connected
to that family's operation. Marley believed appellant was born in Luevano, Mexico, one of the
towns in which the Jaimes group finds people who want to be smuggled into the United States. 
On cross-examination, however, Marley conceded that appellant might have left Mexico at age
ten and that he might have been born elsewhere.

 Eagle Pass area law enforcement officers testified about arrests there. Eagle Pass
police officer Henry Cardona said that, during 1996 and 1997, his office recovered Suburbans
and trucks stolen from Austin--sometimes as many as five a day; the evidence of the theft matched
the method the accomplices described, as did descriptions of the uses and usefulness of the
vehicles. He did not know who stole the nearly three hundred trucks, but did know that among
those arrested in Eagle Pass in connection with the thefts included Jacinto Benitez, Antonio
Jaimes, Pedro Jaimes, and Emilio Alfonso. Eagle Pass officer Johnny Munoz testified that he
arrested appellant's brother, Noe Alcaraz, in Eagle Pass in a stolen truck. Maverick County
deputy constable Jose Angel Montes, Jr., testified regarding his arrest of Labra in Eagle Pass in
connection with a truck stolen from Austin; Montes had never seen appellant. Zavala County
deputy sheriff Osbaldo Lopez also testified regarding the use of stolen Austin vehicles transporting
illegal aliens through his county. Lopez testified that he had stopped appellant on the highway
about ten times, usually after midnight, for offenses like driving without lights or speeding. 
Appellant was always driving a different vehicle, not registered to him, but never had more
passengers than a woman and child. Appellant was nervous and appeared to be concocting
stories, but never fled. Lopez said all his warrant checks were negative, he never arrested
appellant, and he only issued him one ticket. Lopez agreed that Mexican-born people often drove
those roads on their way to visit family.

 Austin police detective Arthur Arevalo participated in the investigation because of
the involvement of Austin gang members in the thefts. He discussed tracking a vehicle driven by
Pedro Jaimes from Austin to Eagle Pass and back. Pedro Jaimes's truck traveled a similar path
to a truck stolen in Austin, including going to a farmhouse near Batesville, which is roughly
between Austin and Eagle Pass. Appellant got into Pedro Jaimes's truck in Eagle Pass and was
in it when the truck was stopped en route in LaPryor; Antonio Jaimes was also a passenger. 
Arevalo also testified that, when he went to arrest appellant, he found a stolen cellular phone and
stolen car stereo in appellant's apartment as well as seven stolen vehicles in the apartment complex
parking lot. He conceded that many people lived in the complex and that the parking lot was open
to the public. He also conceded that appellant was never seen driving a stolen vehicle or
transporting illegal aliens. Appellant's fingerprints were not found on any of the recovered stolen
vehicles.

 Austin police officer Kenneth Roberts testified, supported by phone records, that
someone used cell phones stolen from vehicles to call numbers registered to appellant and some
of the accomplice witnesses. He also said that calls were made from appellant's phone to one of
the accomplice witnesses arrested for theft. Roberts admitted he did not know the caller or
receiver of any of these phone calls.

 The defense introduced evidence showing that none of the fingerprints from the
stolen vehicles were appellant's fingerprints. Appellant's brother, Epifano Alcaraz, a convicted
car thief, testified that he himself often was called "Chino," the name by which some accomplice
witnesses knew appellant.

 We conclude that sufficient non-accomplice evidence corroborates the testimony
of the accomplice witnesses and tends to connect appellant to the offense. A reasonable jury could
conclude that the non-accomplice evidence tends to show appellant's involvement in the
conspiracy because he possessed and used a cellular phone from a stolen vehicle, he conversed
often with truck thieves, he had easy access to the many stolen trucks found in his apartment
complex parking lot, and he often traveled between Eagle Pass and Austin. These Eagle Pass-Austin travels were suspicious because of their late hour, his nervousness and suspect stories, and
his use of many different vehicles (including the trip as a passenger in a conspirator's truck as it
apparently shadowed a stolen truck). Although this evidence may not be sufficient alone to
convict appellant of the thefts, corroborative non-accomplice evidence need not directly connect
him to the offense or be sufficient to convict him of it. See Hernandez, 939 S.W.2d at 176. We
overrule point two.

 Because other non-accomplice witness evidence sufficiently corroborates the
accomplices' testimony without considering Martinez's testimony, there is no harm from any error
in the denial of her claim of spousal privilege. The addition of her testimony that appellant's
brother Noe and one of the accomplice witnesses occasionally visited appellant, and that she once
heard the three talking about "going to pick up some people" did not add any significant
corroboration. The stolen cars in his complex, the stolen cellular phone in his apartment, and the
numerous phone calls to and from confessed car thieves on the stolen phone and on his own phone
were much more powerful corroboration and were sufficient without her testimony to corroborate
the accomplice witnesses' testimony. We overrule both points of error.

 We affirm the conviction.



 


 Marilyn Aboussie, Chief Justice

Before Chief Justice Aboussie, Justices Kidd and Smith

Affirmed

Filed: May 4, 2000

Do Not Publish

1. Appellant's name is spelled "Alcarez" in some documents other than the indictment and
judgment.
2. The State asserts without contradiction that appellant had been in jail since March 1998.


e detective Arthur Arevalo participated in the investigation because of
the involvement of Austin gang members in the thefts. He discussed tracking a vehicle driven by
Pedro Jaimes from Austin to Eagle Pass and back. Pedro Jaimes's truck traveled a similar path
to a truck stolen in Austin, including going to a farmhouse near Batesville, which is roughly
between Austin and Eagle Pass. Appellant got into Pedro Jaimes's truck in Eagle Pass and was
in it when the truck was stopped en route in LaPryor; Antonio Jaimes was also a passenger. 
Arevalo also testified that, when he went to arrest appellant, he found a stolen cellular phone and
stolen car stereo in appellant's apartment as well as seven stolen vehicles in the apartment complex
parking lot. He conceded that many people lived in the complex and that the parking lot was open
to the public. He also conceded that appellant was never seen driving a stolen vehicle or
transporting illegal aliens. Appellant's fingerprints were not found on any of the recovered stolen
vehicles.

 Austin police officer Kenneth Roberts testified, supported by phone records, that
someone used cell phones stolen from vehicle