COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-07-008-CR

 

 

CHRISTOPHER CALVIN KENNEDY                                           APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

        FROM CRIMINAL
DISTRICT COURT NO. 1 OF TARRANT COUNTY

 

                                              ------------

 

MEMORANDUM OPINION[1] ON STATE=S PETITION FOR
DISCRETIONARY REVIEW

 

                                              ------------

After reviewing the State=s petition for
discretionary review, we modify our opinion and judgment in this appeal. See
Tex. R. App. P. 50. We withdraw
our May 8, 2008 opinion and judgment and substitute the following.

 








I. 
Introduction

In four points, Appellant Christopher
Calvin Kennedy complains that (1) his two convictions in this case violated his
double jeopardy constitutional protection, (2) his spousal privilege was
violated, (3) the trial court erred in allowing videotaped hearsay, and (4)
corroborating witness evidence was insufficient to support his conviction.  We affirm in part and reverse and render in
part.

II. 
Factual Background

This is the case of the twice-eaten horse.  On April 13, 2006, Heath Cook, a detective
with the Arlington Police Department, was working on an undercover narcotics
investigation involving an individual named Damon Ochoa. Cook had set up a drug
buy from Ochoa for approximately one pound of methamphetamine and had agreed to
meet Ochoa in a Kroger grocery store parking lot in Grand Prairie, Texas, at
approximately 10:30 p.m. 








Earlier that same day, Kama Brooks, who was
shopping at Town East Mall with Kennedy=s Asignificant
other@ Randee
Poyner,[2]
received a call from Ochoa.  Ochoa asked
Brooks if she would contact Kennedy and ask him to get Ochoa a pound of
methamphetamine.  Brooks called Kennedy,
and Kennedy told Brooks that he would see what he could do.  As Brooks and Poyner were leaving the mall,
Kennedy called Brooks back and asked her to stop by his home and pick up a gun
and a safe and then to meet him at Ochoa=s
house.  Brooks and Poyner were in Kennedy=s Ford
Expedition, and after they retrieved the gun and the safe, Brooks and Poyner,
with Poyner and Kennedy=s three-month-old baby, went to
Ochoa=s home. 

When Kennedy separately arrived at Ochoa=s home,
Kennedy walked over to the Expedition and placed a package in the back of the
vehicle.  Kennedy and Ochoa then
discussed the situation in the back of the vehicle and decided that Kennedy
would follow Ochoa to the scene of the drug deal with the methamphetamine
because the drug deal involved a large amount of cash and drugs.  Brooks and Ochoa, who had a nine-millimeter
gun with him, then drove to the Kroger parking lot, while Poyner, Kennedy, and
their three-month-old baby followed in the Expedition. 








After Ochoa and Brooks arrived at the Kroger
parking lot, Ochoa walked over to a black Chevrolet truck and got into the
vehicle with Cook, whereupon the two began discussing the logistics of the
transaction. Ochoa, who carried the pistol between his belt and his pants, let
Cook know that he didn=t have the narcotics with him;
rather, another person had them at a nearby Burger King, and that person wanted
to move the transaction to the Burger King. 
Cook refused to move the transaction, and Ochoa then said he would go
and talk to the other person and get back with Cook. 

Cook observed Ochoa walk over to Kennedy=s
Expedition and sit in the car for about twenty or thirty seconds.  Ochoa then walked straight back to Cook=s
vehicle, got into Cook=s truck, and pulled a pound of
methamphetamine out of the crotch area of his pants.  At that point, Cook gave the prearranged
signal to the members of the SWAT arrest team to take over the scene, and they
arrested Ochoa and Brooks.  When the
arrest team members approached Cook=s truck,
Kennedy sped away in the Expedition, which was stopped by a marked patrol unit
approximately one mile away.  Kennedy was
identified as the person driving the Expedition and was arrested. 

At trial, the State presented the testimony of
Poyner, whose assertion of the spousal privilege against testifying was
overruled by the trial court.  The State
also presented the testimony of Brooks, who testified that on April 13, 2006,
she lived with Kennedy and Poyner, that she periodically slept with Ochoa, and
that at Ochoa=s request, she had asked Kennedy
if he could supply a pound of methamphetamine. 
She also testified that Kennedy agreed to supply the methamphetamine and
to follow Ochoa and Brooks to the transaction location with the methamphetamine
in his vehicle.  Cook and others also
testified at trial.








 

III. 
Procedural Background

Kennedy was indicted for delivery of  methamphetamine over 400 grams and for
possession with intent to deliver methamphetamine over 400 grams, based on the
April 13, 2006 drug bust.  The indictment
contained a deadly weapon notice.  A jury
found Kennedy guilty of each count and assessed punishment at fifteen years=
confinement on each count, each with a $100 fine, but made no deadly weapon
finding.  Following sentencing, this
appeal ensued.

IV.  Double
Jeopardy

In his first point, Kennedy asserts that his
conviction on both counts of the indictment violates his double jeopardy
constitutional protection. 

A.  Standard of Review

The Double Jeopardy Clause of the United States
Constitution provides that no person shall be subjected to twice having life or
limb in jeopardy for the same offense.  U.S. Const. amend. V.  Generally, this clause protects against (1) a
second prosecution for the same offense after acquittal, (2) a second
prosecution for the same offense after conviction, and (3) multiple punishments
for the same offense.  Brown v. Ohio,
432 U.S. 161, 165, 97 S. Ct. 2221, 2225 (1977); Ex parte Herron, 790
S.W.2d 623, 624 (Tex. Crim. App. 1990) (op. on reh=g).








To determine whether both offenses are the same,
we must examine the elements of the applicable statutes to determine whether
each statute Arequires proof of an additional
fact which the other does not.@  Blockburger v. United States, 284 U.S.
299, 304, 52 S. Ct. 180, 182 (1932); see United States v. Dixon, 509
U.S. 688, 696, 113 S. Ct. 2849, 2856 (1993); Parrish v. State, 869
S.W.2d 352, 353-55 (Tex. Crim. App. 1994). 
The general rule is that greater inclusive and lesser included offenses
are the same for double jeopardy purposes. 
Parrish, 869 S.W.2d at 354. 

When a defendant has been prosecuted and
convicted in a single criminal action of two or more offenses that constitute
the same offense, in violation of double jeopardy, the remedy is to apply Athe most
serious offense test.@ 
See Ex parte Cavazos, 203 S.W.3d 333, 337 (Tex. Crim. App. 2006).
The Amost
serious@ offense
is the offense for which the greatest sentence was assessed.  Id. at 337-38. 

B. 
Analysis








The State agrees with Kennedy that the same
conduct was offered to prove both delivery and possession with intent to
deliver and that this violates Kennedy=s double
jeopardy protection.  We also agree.  In Lopez v. State, 80 S.W.3d 624, 627
(Tex. App.CFort
Worth 2002), aff=d, 108
S.W.3d 293 (Tex. Crim. App. 2003), Lopez was charged in a two-count indictment
with delivery of over 400 grams of cocaine and with possession and intent to
deliver cocaine of over 400 grams.  We
noted that the alleged offenses occurred on the same day and that the same
evidence was proferred for both the delivery charge and the possession with
intent to deliver charge.  Id. at
627-28.  Hence, we found Athat it
was a violation of double jeopardy prohibitions to punish Appellant for both
delivery and possession with intent to deliver the same quantity of cocaine.@  Id. at 628.  Turning to the Amost
serious offense test@ and noting that the same
punishment was assessed for both offenses, we hold that the conviction for delivery
of the methamphetamine should be retained and the conviction for possession
with intent to deliver the methamphetamine should be vacated.  See id. at 629.  Kennedy=s first
point is sustained.

 

V.  Spousal
Privilege

In his second point, Kennedy asserts that the
testimony of Poyner violated his spousal privilege protection and that the
trial court erred by admitting the testimony.

A. 
Standard of Review








APreliminary questions concerning
the qualification of a person to be a witness, the existence of a privilege, or
the admissibility of evidence shall be determined by the court.@  Tex.
R. Evid. 104(a).  We review the
trial court=s decision on the applicability
of a privilege for an abuse of discretion. 
See Welch v. State, 908 S.W.2d 258, 265 (Tex. App.CEl Paso
1995, no pet.); Anderson v. State, 880 S.W.2d 35, 37 (Tex. App.CTyler
1994, pet. ref=d); Reece v. State, 772
S.W.2d 198, 201 (Tex. App.CHouston
[14th Dist.] 1989, no pet.) (all discussing husband‑wife privilege); see
also Green v. State, 934 S.W.2d 92, 101-02 (Tex. Crim. App. 1996 (AWe
review the trial court=s decision to admit or exclude
evidence under an abuse of discretion standard.@).  If the trial court=s ruling
falls within the zone of reasonable disagreement and is correct under any
theory of law applicable to the case, we affirm its decision.  Winegarner v. State, 235 S.W.3d 787,
790 (Tex. Crim. App. 2007).  Conversely,
if the decision is not within the zone, the trial court abused its discretion,
and we will perform a harm analysis.  See
Tex. R. App. P. 44.2(b); Moon
v. State, 44 S.W.3d 589, 594-95 (Tex. App.CFort
Worth 2001, pet. ref=d). 

As pointed out by both Kennedy and the State,
when the existence of an informal marriage must be addressed as a preliminary
issue, the trial court is the sole factfinder and in that capacity may believe
or disbelieve all or any part of any witness=s
testimony.  Durand v. State, 881
S.W.2d 569, 576 (Tex. App.CHouston
[1st Dist.] 1994), judgm=t
vacated on other grounds, 958 S.W.2d 395 (Tex. Crim. App. 1996).

B.  The
Evidentiary Rule








According to rule 504, entitled AHusband-Wife
Privileges,@ the spouse of an accused has a
privilege not to be called as a witness for the state.  Tex.
R. Evid. 504(b).  However, this
privilege does not apply to matters occurring prior to marriage.  Tex.
R. Evid. 504(b)(4)(B).  It is the
person claiming the privilege who bears the burden of proof of marriage.  Welch v. State, 908 S.W.2d 258, 264-65
(Tex. App.CEl Paso 1995, no pet.).  In this case, where it is undisputed that
there had not been a ceremonial marriage at the time of the alleged offenses,
Kennedy must show that (1) Kennedy and Poyner agreed to be married, (2) they
lived together as husband and wife, and (3) they represented to others that, in
fact, they were husband and wife.  Colburn
v. State, 966 S.W.2d 511, 514 (Tex. Crim. App. 1998).  

C.  The
Evidence

1. Testimony of Poyner

Q. [Poyner], state your
full name for the record.

 

A.  Randee Brook Kennedy.

 

. . . . 

 

Q. . . . And at some
point you and he represented to others that you were married?

 

A.  Yes, sir.

 

Q.  Can you tell me how soon after July >05 that happened?

 








A.  When -- we would introduce ourselves to
coworkers and people we met as husband and wife.

 

Q.  And was that almost immediately?

 

A.  Yes, sir.

 

Q.  When I say almost immediately, you mean
within 30 days?

 

. . . .

 

Q.  Now, you and he have a child?

 

A.  Yes, sir.

 

. . . .

 

Q. . . . And the birth
certificate of that child was -- who is the father?

 

A.  Christopher Kennedy.

 

. . . . 

 

Q.  You said that almost immediately after you
met him or moved in with him you were holding yourself out as married, correct?

 

A.  Yes, sir.

 

Q.  How would that go?

 

A.  I was pregnant with our child.  We were a little old to be calling each other
boyfriend and girlfriend; it sounds high school.  And we have talked about it.

 

Q.  And so girlfriend and boyfriend at your age
sounded preposterous, so you said what? 
What would you call yourself?

 

A.  Husband and wife.

 








Q.  And you talked about calling yourselves
husband and wife?

 

A.  Yes.

 

Q.  And the rationale for calling yourselves
husband and wife was basically that it sounded very high schoolish, and you=re pregnant, so why
should you be calling yourself boyfriend and girlfriend?

 

A. . . . We were going to be legally married; at
the time, we couldn=t.        

 

Q.  You planned to get legally married in the
future and, therefore, you decided to call yourselves husband and wife now?

 

A.  Yes.

 

. . . .

 

Q. . . . You represented
to others that you were in this state, and you lived together and decided to
call each other man and wife in this state?

 

A.  Yes, sir.

 

. . . .

 

Q. . . . [Y]ou told the
police you were married that night?

 

A.  I believe so.

 

. . . .

 

Q. . . . [Y]ou didn=t know that you were
really common-law married until you talked to the defense attorneys in this
case?

 

A.  I perceived myself as common-law, and then I
got the misunderstanding that we weren=t because of signing the document before the
county clerk.  But I still -- he --
before we were legally, he was still my husband.

 








2. 
Testimony of Brooks

Q.  Kama, in that interview did you refer to her
as the wife or as girlfriend on several occasions?

 

A.  Both.

 

Q.  Both. 
Why both?

 

A.  Because they were living together and they
had a baby together.

 

Q.  All right. 
In fact, I think at one point you referred to Chris as his wife or his
girlfriend.  Why did you correct
yourself?

 

A.  I=m not sure, honestly.

 

. . . . 

 

Q. . . . What was Randee
Poyner Kennedy, now Kennedy, Randee Poyner and Chris Kennedy=s status at that time?

 

A.  They were girlfriend/boyfriend living
together and had a child together.

 

Q.  Had they told you they were husband and wife?

 

A.  No.

 

3.  Testimony of Gerard Gonzalez

Q.  Did Mr. Kennedy represent to you and others
at your business that he was married to Mrs. Kennedy?

 

A.  Not in a -- like common-law.  It was like a common-law marriage at that
point in time.

 

Q.  So he represented B

 








A.  Right. 
That they were together, they had a baby together, they lived together.

 

Q.  And you believed Mr. and Mrs. Kennedy to be
informally married or through common-law marriage?

 

A.  Correct.

 

4. 
Testimony of Kennedy

Q.  At any point on that tape did you refer to
her as your wife?

 

A.  No, sir. 
But I did refer to her as my wife to the arresting officer.

 

. . . . 

 

Q.  So, sir, after you were arrested and it=s apparent that your wife
or your girlfriend at that time, now wife, could be a witness, all of a sudden
you were able to scrape up the money to get married?

 

A.  Well, that really never crossed my mind.

 

. . . .

 

Q.  You and your wife had spoken of having a
ceremonial marriage at some later point in time before any of these allegations
came up, correct?

 

A.  Yes, sir. 
It would -- it was actually -- we had spoke of it in a conversation that
her father -- her mother and father, we had. 
And we had talked about marriage then to her mother and father.

 

Q.  But in the summer of 2005, did you consider
yourself already married?

 

A.  Yes, but not legally.  Not legally. 
We represented ourselves to others as married.  If I met somebody new, you know, I
represented her as my wife.

 








Q.  And by legally married, perhaps you are
misunderstanding the status of the law. 
Do you mean that you weren=t ceremonially married?

 

A.  Yes, sir. 
We were not ceremonially married.

 

. . . .

 

Q.  Did you file joint tax returns in 2005?

 

A.  No, sir, we didn=t because we=re not legally
married.  Therefore, it would have been
fraudulent. 

 

Q.  When you get checks, when your wife got
checks at that time was it in her name or in her married name?

 

A.  There again, sir, we were not legally
married, so she could not take my name.

 

D. 
Analysis

Under the appropriate standard of review as
previously recounted, and bearing in mind that Kennedy bore the burden of proof
and that the trial court could believe or disbelieve all or any part of any
witness testimony, we hold that the trial court did not abuse its discretion by
allowing Poyner to testify.  








Even if the admission of her testimony were
error, it was undoubtedly harmless.  See
Tex. R. App. P. 44.2(b).  We review nonconstitutional error to
determine whether it affected a substantial right.  See id.  A substantial right is affected when the
error had a substantial and injurious effect or influence in determining the
jury=s
verdict.  King v. State, 953
S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing Kotteakos v. United States,
328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)); Coggeshall, 961 S.W.2d
at 643.  In making this determination, we
review the record as a whole.  See
Johnson v. State, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). 

First, it should be noted that, during her
testimony, Poyner repeatedly denied that Kennedy participated in the drug
transaction.  But there was other
competent evidence supporting Kennedy=s
participation, including testimony that (1) Ochoa asked Brooks to call Kennedy
and ask him if he could get Ochoa a Apound of
ice,@ (2)
Kennedy asked Brooks and Poyner to stop by his house and pick up a safe and a
gun before meeting him at Ochoa=s home,
(3) Ochoa and Kennedy decided that Kennedy would follow Ochoa and Brooks to the
Kroger parking lot with the methamphetamine, (4) Detective Cook saw Kennedy=s car in
the Kroger parking lot when the drug deal occurred, (5) Ochoa told Detective
Cook that he had to get the methamphetamine from a friend, (6) Ochoa walked
from the detective=s car to Kennedy=s car,
returned to the detective=s car and pulled the
methamphetamine out of his pants, (7) the drug that Ochoa gave to the detective
was 444 grams of methamphetamine, and (8) Kennedy fled when the police busted
the drug transaction.








We conclude that, in the context of the entire
case against Kennedy, the trial court=s error,
if any, in admitting Poyner=s
testimony did not have a substantial or injurious effect on the jury=s
verdict and did not affect Kennedy=s
substantial rights.  See Tex. R. App. P. 44.2(b); King,
953 S.W.2d at 271.  We overrule Kennedy=s second
point.

VI.  The
Videotape

In his third point, Kennedy asserts that the
trial court erred by admitting a videotape of Poyner=s
interrogation by police.  

A. 
Background








During her testimony at trial, Poyner denied that
she and Kennedy appeared at the Kroger parking lot to conduct a drug deal.  However, she also testified that she had told
the arresting officers on videotape just the oppositeCthat she
and Kennedy did appear at the Kroger parking lot to conduct a drug deal.  Her explanation for the discrepancy was that
she was told what to say during her videotaped interrogation by the narcotics
officers, who threatened to send her to jail and her daughter to CPS if she
refused.  In other words, it was Poyner=s
testimony at trial that she was not telling the truth during the interrogation,
when she admitted she and Kennedy were together for a drug deal, because of
police coercion.[3]  The State then offered the videotape into
evidence, asserting that it would allow the jury to 

evaluate the credibility
the witness on the tape and judge for themselves if she is telling the truth
now or she was telling the truth then. 
She has unequivocally told the jury that she is denying that they would
see that on the tape and that it is truthful. . . . It=s not being offered for
the truth of the matter asserted.  It=s also contextual
circumstantial in the sense that she has now told the jury it is a scripted
kind of event.  And if you watch that
tape, . . . you can tell that she is volunteering information on the fly.  They couldn=t possibly have been
scripted.[4]  

 








Counsel for Kennedy objected that the offer constituted hearsay, was
improper impeachment, and was more prejudicial than probative.[5]  The trial court admitted the videotape and
instructed the jury before viewing it that Athe tape
was not offered for the truth of the matter asserted.@   

B. 
Analysis

We have previously observed that the admission of
evidence is reviewed under an abuse of discretion standard.  See Green, 934 S.W.2d at 101-02.








It is axiomatic that hearsay is inadmissible Aexcept
as provided by statute or these rules or by other rules prescribed pursuant to
statutory authority.@ Tex. R. Evid. 802. A>Hearsay= is a
statement, other than one made by the declarant while testifying at the trial
or hearing, offered in evidence to prove the truth of the matter asserted.@  Tex.
R. Evid. 801(d).  Kennedy
complains that the State failed to point out any exception to the hearsay rule
allowing admission of the videotape. 
However, the State asserts that the tape was not hearsay at all and was
introduced to Arebut Poyner=s claims
that the police threatened and coerced her into falsely stating that [Kennedy]
was at the parking lot in order to conduct the drug deal.@[6]  In other words, the videotape was not offered
for the truth of the matter assertedCthat is,
whether she and Kennedy were in the parking lot to do a drug dealCbut
rather to rebut the alleged police coercion. 
We agree.  The statements in the
videotape were not offered for the truth of the matter asserted, as instructed
by the trial court, and therefore did not constitute hearsay.  

C. 
Improper Impeachment

Kennedy also argues that the videotape was
inadmissible as improper impeachment, focusing on that portion of rule 613(a)
entitled AExamining Witness Concerning
Prior Inconsistent Statement,@ which
reads, AIf the
witness unequivocally admits having made such statement, extrinsic evidence of
same shall not be admitted.@  Tex.
R. Evid. 613(a).  We have
previously held that the videotape statement was admitted into evidence to
rebut the allegations of police misconduct through coercion, and not whether
Poyner and Kennedy were in the Kroger parking lot for a drug deal.  It is this latter assertion regarding the
drug deal that Poyner admitted telling the police about previously, and there
were no admissions by Poyner about absence of police coercion.  Therefore this argument is without merit.

D.  Rule
403 Objection








Kennedy also made a rule 403 objection.  Rule 403 of the Texas Rules of Evidence reads
as follows: AAlthough relevant, evidence may
be excluded if its probative value is substantially outweighed by the danger of
unfair prejudice . . . .@ 
Tex. R. Evid. 403.

Once Kennedy made the objection, the trial court
had to weigh the probativeness of the evidence to determine if it was
substantially outweighed by its potential for unfair prejudice.  Santellan v. State, 939 S.W.2d 155,
169 (Tex. Crim. App. 1997). A rule 403 balancing test includes the following
factors:  (1) the inherent probative
force of the proffered item of evidence along with (2) the proponent=s need
for that evidence against (3) any tendency of the evidence to suggest decision
on an improper basis, (4) any tendency of the evidence to confuse or distract
the jury from the main issues, (5) any tendency of the evidence to be given
undue weight by a jury that has not been equipped to evaluate the probative
force of the evidence, and (6) the likelihood that presentation of the evidence
will consume an inordinate amount of time or merely repeat evidence already
admitted.  Gigliobianco v. State,
210 S.W.3d 637, 641B42 & n.8 (Tex. Crim. App.
2006).








The rules of evidence favor the admission of
relevant evidence and carry a presumption that relevant evidence is more
probative than prejudicial.  Jones v.
State, 944 S.W.2d 642, 652 (Tex. Crim. App. 1996).  When determining whether evidence is
admissible under rule 403, we do not consider just whether the evidence is more
prejudicial than probative; we consider whether the probative value is substantially
outweighed by the danger of unfair prejudice.  Garcia v. State, 201 S.W.3d 695, 704
(Tex. Crim. App. 2006).  Our highest
criminal court has observed that we will only reverse the trial court=s
judgment under rule 403 Ararely and only after a clear
abuse of discretion.@ 
Mozon v. State, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999).  And this is as it should be.  It is the trial judge, in the midst of the
trial itself, who is in the best position to weigh the probative versus prejudicial
value of evidence on Themis=s scales
of justice.  See id.  








Turning to the relevant factors of those
previously enumerated, it was incumbent upon the State to attempt to rebut the
allegations of police misconduct through coercion because, immediately before
and after the six-minute videotape was played, Poyner testified that everything
she said on the videotape was coerced and scripted.  The trial court negated any tendency of the
evidence to suggest to the jury that Kennedy was guilty, or to distract the
jury from the coercion issue, by instructing the jury that it was not to
consider the videotape for the truth of the matters asserted therein.  And, we generally presume that the jury
follows the trial court=s instructions, including a
limiting instruction regarding certain testimony.  Adams v. State, 179 S.W.3d 161, 165
(Tex.  App.CAmarillo
2005, no pet.).  Therefore, under the
appropriate standard of review, the trial judge=s
decision was outside the zone of disagreement. 
We hold that the Rule 403 objection was properly overruled by the trial
court.

E. 
Harmless Error

Regardless of the foregoing arguments regarding
the admissibility of the videotape, even assuming error, it would also be
harmless. 








We agree with the parties that any error is of a
nonconstitutional dimension.  That said,
as previously discussed above, any error would have to affect substantial
rights of the accused to be reversible.  Tex. R. App. P. 44.2(b).  We have fair assurance that the judgment was
not substantially swayed by the error.  See
Garcia v. State, 126 S.W.3d 921, 927 n.9 (Tex. Crim. App. 2004).  As pointed out by the State, other evidence
of Kennedy=s culpability included at least
that (1) Ochoa asked Brooks to call Kennedy and ask him if he could get Ochoa a
Apound of
ice@; (2)
Kennedy asked Brooks and Poyner to stop by his house and pick up a safe and a
gun before meeting him at Ochoa=s home;
(3) Ochoa and Kennedy decided that Kennedy would follow Ochoa and Brooks to the
Kroger parking lot with the methamphetamine; (4) Detective Cook saw Kennedy=s car in
the Kroger parking lot when the drug deal occurred; (5) Ochoa told Detective
Cook that he had to get the methamphetamine from a friend; (6) Ochoa walked
from the detective=s car to Kennedy=s car,
returned to the detective=s car and pulled the
methamphetamine out of his pants; (7) the chemist testified that the drug that
Ochoa gave to the detective was 444 grams of methamphetamine; and (8) Kennedy
fled when the police busted the drug transaction. 

We conclude that, in the context of the entire
case against Kennedy, the trial court=s error,
if any, in admitting the videotape, did not have a substantial or injurious
effect on the jury=s verdict and did not affect
Kennedy=s
substantial rights.  See King, 953
S.W.2d at 271.  Thus, we disregard the
error.  See Tex. R. App. P. 44.2(b).  Kennedy=s point
number three is overruled.

VII. 
Accomplice Witness Testimony

In his fourth point, Kennedy asserts that the
accomplice witness testimony, that of Brooks, was not sufficiently corroborated
to support the conviction.

A.  The
Rule and the Law

Article
38.14 of the Texas Code of Criminal Procedure (the ARule@) states 

A conviction cannot be
had upon the testimony of an accomplice unless corroborated by other evidence
tending to connect the defendant with the offense committed; and the
corroboration is not sufficient if it merely shows the commission of the
offense.

 

Tex.
Code Crim. Proc. Ann. 38.14 (Vernon 2005).  








An accomplice is one who participates with the
defendant before, during, or after the commission of a crime by doing some
affirmative act promoting the commission of that offense and who could be
prosecuted for the same offense, or a lesser included offense, as the
defendant.  Blake v. State, 971
S.W.2d 451, 454-55 (Tex. Crim. App. 1998). 
When conducting our sufficiency review regarding the Rule, we are
required to eliminate Brooks=s
testimony from consideration and review the remaining record to see if there is
evidence that tends to connect Kennedy with the commission of the crimes
alleged herein.  See Solomon v. State,
49 S.W.3d 356, 361 (Tex. Crim. App. 2001). 
This evidence does not need to be strong enough to establish Kennedy=s guilt
beyond a reasonable doubt and need not directly link him to the commission of
the alleged crimes.  Id.; see also
Hernandez v. State, 939 S.W.2d 173, 176-79 (Tex. Crim. App. 1997)
(demonstrating the application of this rule).

B. 
Analysis








Once more recounting the evidence tending to show
Kennedy=s guilt,
but without considering Brooks=s
testimony, the following evidence was presented at trial.  Cook testified that he had arranged a drug
buy with Ochoa and that they met in a Kroger parking lot off of I-20, that
Ochoa told him that the drugs were with his friends, that he then watched Ochoa
get into a white Ford Expedition, and that Ochoa immediately returned and
transferred to Cook a pound of methamphetamine. 
He also testified that the Expedition left the scene quickly.  Jim West, the Grand Prairie patrol officer
who stopped the Expedition not far from the scene, on an I-20 service road,
testified that the Arlington Police Department, Narcotics, had requested their
assistance in chasing down the Expedition. 
He also testified that the Expedition contained a male driver, a female
passenger, and a baby.

Poyner testified that she, Kennedy, and their
baby were in the Kroger parking lot at 10:30 p.m. that night in a white Ford
Expedition, that Kennedy was the driver, and that Ochoa and Brooks were also
there, in a different vehicle.  She
testified that she and Kennedy did not go out there that night to do a drug
deal, that they did not know about a drug deal until Ochoa got into the
Expedition, that they left, that they were stopped by the police on I-20, and
that Kennedy was innocent.  The senior
forensic chemist testified that the substance submitted to her by the Arlington
Police Department corresponding to this case was 444 grams of methamphetamine.

After considering the evidence without Brooks=s
testimony, and given the jury=s role
in resolving conflicts in the testimony, including witness credibility, we hold
that, even without Brooks=s testimony, there is sufficient
corroborating evidence tending to connect Kennedy to the commission of the
crime.  See Solomon, 49 S.W.3d at 361; Margraves v. State,
34 S.W.3d 912, 919 (Tex. Crim. App. 2000); Hernandez, 939 S.W.2d at
176-79.  We overrule Kennedy=s fourth
point.  

VIII. 
Conclusion








Having overruled Kennedy=s last
three points, we affirm the trial court=s
judgment as to his conviction and sentence for delivery of four hundred grams
or more of methamphetamine.  But having
sustained Kennedy=s first point, we vacate his
conviction for possession and intent to deliver methamphetamine of four hundred
grams or more.  See Lopez, 80
S.W.3d at 627B29, 630B31.

 

 

PER
CURIAM

 

PANEL F:    MCCOY,
J.; CAYCE, C.J.; and LIVINGSTON, J.

 

LIVINGSTON, J. concurs
without opinion.

 

DO NOT PUBLISH

Tex.
R. App. P.
47.2(b)

 

DELIVERED: June 19, 2008

 











[1]See Tex. R. App. P. 47.4.





[2]An issue in this case is
whether Randee Poyner was Kennedy=s girlfriend or Kennedy=s wife at the time of the
drug bust.  They were subsequently
ceremonially married in October 2006. 
She will be referred to in this opinion as APoyner.@





[3]Prosecutor to Poyner:

 

Q.  You are telling this jury that if they were
to see that videotape they would not see somebody telling the truth on the
videotape?

 

A.  Yes, sir.

 

. . . . 

 

Q.  They would not see somebody answering
questions on the fly rather than reading from a script or acting?

 

A.  Yes, sir.





[4]The State=s counsel also observed
that Kennedy=s attorney was Areally asking the court
to have me . . . eat the horse twice.@  A
thorough search of the Texas Rules of Evidence and Texas Rules of Civil
Procedure has failed to divine the evidentiary or procedural rule to which this
statement refers, but if accurate, it seems validly objectionable, horsemeat
not being commonly known as a delicacy.





[5]It is noted that counsel
for Kennedy referred to Randee as AMs. Poyner.@ 





[6]The court has reviewed
the videotape.  It is clear from the
videotape that Poyner=s statements were
unscripted and uncoerced: she explained to the two officers, while holding her
baby, that this was the Afirst time@ and that Kennedy only
did it as a favor for Ochoa, to help Brooks, and because she and Kennedy were
behind on their bills and needed the money to make a car payment.  One of the officers asked if she had family
that could come and get her and the baby; she said, Ano,@ and started crying.