

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 2-07-008-CR

CHRISTOPHER CALVIN KENNEDY                    APPELLANT

V.

THE STATE OF TEXAS                                        STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 1 OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1] ON STATE'S PETITION FOR DISCRETIONARY REVIEW

------------

After reviewing the State's petition for discretionary review, we modify our opinion and judgment in this appeal. *See* TEX. R. APP. P. 50. We withdraw our May 8, 2008 opinion and judgment and substitute the following.

---

[1] *See* TEX. R. APP. P. 47.4.

## I. Introduction

In four points, Appellant Christopher Calvin Kennedy complains that (1) his two convictions in this case violated his double jeopardy constitutional protection, (2) his spousal privilege was violated, (3) the trial court erred in allowing videotaped hearsay, and (4) corroborating witness evidence was insufficient to support his conviction. We affirm in part and reverse and render in part.

## II. Factual Background

This is the case of the twice-eaten horse. On April 13, 2006, Heath Cook, a detective with the Arlington Police Department, was working on an undercover narcotics investigation involving an individual named Damon Ochoa. Cook had set up a drug buy from Ochoa for approximately one pound of methamphetamine and had agreed to meet Ochoa in a Kroger grocery store parking lot in Grand Prairie, Texas, at approximately 10:30 p.m.

Earlier that same day, Kama Brooks, who was shopping at Town East Mall with Kennedy's "significant other" Randee Poyner,[2] received a call from Ochoa. Ochoa asked Brooks if she would contact Kennedy and ask him to get Ochoa a pound of methamphetamine. Brooks called Kennedy, and Kennedy

---

[2] An issue in this case is whether Randee Poyner was Kennedy's girlfriend or Kennedy's wife at the time of the drug bust. They were subsequently ceremonially married in October 2006. She will be referred to in this opinion as "Poyner."

2

told Brooks that he would see what he could do. As Brooks and Poyner were leaving the mall, Kennedy called Brooks back and asked her to stop by his home and pick up a gun and a safe and then to meet him at Ochoa's house. Brooks and Poyner were in Kennedy's Ford Expedition, and after they retrieved the gun and the safe, Brooks and Poyner, with Poyner and Kennedy's three-month-old baby, went to Ochoa's home.

When Kennedy separately arrived at Ochoa's home, Kennedy walked over to the Expedition and placed a package in the back of the vehicle. Kennedy and Ochoa then discussed the situation in the back of the vehicle and decided that Kennedy would follow Ochoa to the scene of the drug deal with the methamphetamine because the drug deal involved a large amount of cash and drugs. Brooks and Ochoa, who had a nine-millimeter gun with him, then drove to the Kroger parking lot, while Poyner, Kennedy, and their three-month-old baby followed in the Expedition.

After Ochoa and Brooks arrived at the Kroger parking lot, Ochoa walked over to a black Chevrolet truck and got into the vehicle with Cook, whereupon the two began discussing the logistics of the transaction. Ochoa, who carried the pistol between his belt and his pants, let Cook know that he didn't have the narcotics with him; rather, another person had them at a nearby Burger King, and that person wanted to move the transaction to the Burger King. Cook

3

refused to move the transaction, and Ochoa then said he would go and talk to the other person and get back with Cook.

Cook observed Ochoa walk over to Kennedy's Expedition and sit in the car for about twenty or thirty seconds. Ochoa then walked straight back to Cook's vehicle, got into Cook's truck, and pulled a pound of methamphetamine out of the crotch area of his pants. At that point, Cook gave the prearranged signal to the members of the SWAT arrest team to take over the scene, and they arrested Ochoa and Brooks. When the arrest team members approached Cook's truck, Kennedy sped away in the Expedition, which was stopped by a marked patrol unit approximately one mile away. Kennedy was identified as the person driving the Expedition and was arrested.

At trial, the State presented the testimony of Poyner, whose assertion of the spousal privilege against testifying was overruled by the trial court. The State also presented the testimony of Brooks, who testified that on April 13, 2006, she lived with Kennedy and Poyner, that she periodically slept with Ochoa, and that at Ochoa's request, she had asked Kennedy if he could supply a pound of methamphetamine. She also testified that Kennedy agreed to supply the methamphetamine and to follow Ochoa and Brooks to the transaction location with the methamphetamine in his vehicle. Cook and others also testified at trial.

4

### III. Procedural Background

Kennedy was indicted for delivery of methamphetamine over 400 grams and for possession with intent to deliver methamphetamine over 400 grams, based on the April 13, 2006 drug bust. The indictment contained a deadly weapon notice. A jury found Kennedy guilty of each count and assessed punishment at fifteen years' confinement on each count, each with a $100 fine, but made no deadly weapon finding. Following sentencing, this appeal ensued.

### IV. Double Jeopardy

In his first point, Kennedy asserts that his conviction on both counts of the indictment violates his double jeopardy constitutional protection.

#### A. Standard of Review

The Double Jeopardy Clause of the United States Constitution provides that no person shall be subjected to twice having life or limb in jeopardy for the same offense. U.S. CONST. amend. V. Generally, this clause protects against (1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense. *Brown v. Ohio*, 432 U.S. 161, 165, 97 S. Ct. 2221, 2225 (1977); *Ex parte Herron*, 790 S.W.2d 623, 624 (Tex. Crim. App. 1990) (op. on reh'g).

5

To determine whether both offenses are the same, we must examine the elements of the applicable statutes to determine whether each statute "requires proof of an additional fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 182 (1932); *see United States v. Dixon*, 509 U.S. 688, 696, 113 S. Ct. 2849, 2856 (1993); *Parrish v. State*, 869 S.W.2d 352, 353-55 (Tex. Crim. App. 1994). The general rule is that greater inclusive and lesser included offenses are the same for double jeopardy purposes. *Parrish*, 869 S.W.2d at 354.

When a defendant has been prosecuted and convicted in a single criminal action of two or more offenses that constitute the same offense, in violation of double jeopardy, the remedy is to apply "the most serious offense test." *See Ex parte Cavazos*, 203 S.W.3d 333, 337 (Tex. Crim. App. 2006). The "most serious" offense is the offense for which the greatest sentence was assessed. *Id.* at 337-38.

**B. Analysis**

The State agrees with Kennedy that the same conduct was offered to prove both delivery and possession with intent to deliver and that this violates Kennedy's double jeopardy protection. We also agree. In *Lopez v. State*, 80 S.W.3d 624, 627 (Tex. App.—Fort Worth 2002), *aff'd*, 108 S.W.3d 293 (Tex. Crim. App. 2003), Lopez was charged in a two-count indictment with delivery

of over 400 grams of cocaine and with possession and intent to deliver cocaine of over 400 grams.  We noted that the alleged offenses occurred on the same day and that the same evidence was proferred for both the delivery charge and the possession with intent to deliver charge.  *Id*. at 627-28.  Hence, we found "that it was a violation of double jeopardy prohibitions to punish Appellant for both delivery and possession with intent to deliver the same quantity of cocaine."  *Id*. at 628.  Turning to the "most serious offense test" and noting that the same punishment was assessed for both offenses, we hold that the conviction for delivery of the methamphetamine should be retained and the conviction for possession with intent to deliver the methamphetamine should be vacated.  *See id.* at 629.  Kennedy's first point is sustained.

### V.  Spousal Privilege

In his second point, Kennedy asserts that the testimony of Poyner violated his spousal privilege protection and that the trial court erred by admitting the testimony.

#### A.  Standard of Review

"Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court."  TEX. R. EVID. 104(a).  We review the trial court's decision on the applicability of a privilege for an abuse of discretion.  *See Welch*

7

*v. State*, 908 S.W.2d 258, 265 (Tex. App.—El Paso 1995, no pet.); *Anderson v. State*, 880 S.W.2d 35, 37 (Tex. App.—Tyler 1994, pet. ref'd); *Reece v. State*, 772 S.W.2d 198, 201 (Tex. App.—Houston [14th Dist.] 1989, no pet.) (all discussing husband-wife privilege); *see also Green v. State*, 934 S.W.2d 92, 101-02 (Tex. Crim. App. 1996 ("We review the trial court's decision to admit or exclude evidence under an abuse of discretion standard."). If the trial court's ruling falls within the zone of reasonable disagreement and is correct under any theory of law applicable to the case, we affirm its decision. *Winegarner v. State*, 235 S.W.3d 787, 790 (Tex. Crim. App. 2007). Conversely, if the decision is not within the zone, the trial court abused its discretion, and we will perform a harm analysis. *See* Tex. R. App. P. 44.2(b); *Moon v. State*, 44 S.W.3d 589, 594-95 (Tex. App.—Fort Worth 2001, pet. ref'd).

As pointed out by both Kennedy and the State, when the existence of an informal marriage must be addressed as a preliminary issue, the trial court is the sole factfinder and in that capacity may believe or disbelieve all or any part of any witness's testimony. *Durand v. State*, 881 S.W.2d 569, 576 (Tex. App.—Houston [1st Dist.] 1994), *judgm't vacated on other grounds*, 958 S.W.2d 395 (Tex. Crim. App. 1996).

**B. The Evidentiary Rule**

According to rule 504, entitled "Husband-Wife Privileges," the spouse of an accused has a privilege not to be called as a witness for the state. TEX. R. EVID. 504(b). However, this privilege does not apply to matters occurring prior to marriage. TEX. R. EVID. 504(b)(4)(B). It is the person claiming the privilege who bears the burden of proof of marriage. *Welch v. State*, 908 S.W.2d 258, 264-65 (Tex. App.—El Paso 1995, no pet.). In this case, where it is undisputed that there had not been a ceremonial marriage at the time of the alleged offenses, Kennedy must show that (1) Kennedy and Poyner agreed to be married, (2) they lived together as husband and wife, and (3) they represented to others that, in fact, they were husband and wife. *Colburn v. State*, 966 S.W.2d 511, 514 (Tex. Crim. App. 1998).

### C. The Evidence

#### 1. Testimony of Poyner

Q. [Poyner], state your full name for the record.

A. Randee Brook Kennedy.

. . . .

Q. . . . And at some point you and he represented to others that you were married?

A. Yes, sir.

Q. Can you tell me how soon after July '05 that happened?

9

A. When -- we would introduce ourselves to coworkers and people we met as husband and wife.

Q. And was that almost immediately?

A. Yes, sir.

Q. When I say almost immediately, you mean within 30 days?

. . . .

Q. Now, you and he have a child?

A. Yes, sir.

. . . .

Q. . . . . And the birth certificate of that child was -- who is the father?

A. Christopher Kennedy.

. . . .

Q. You said that almost immediately after you met him or moved in with him you were holding yourself out as married, correct?

A. Yes, sir.

Q. How would that go?

A. I was pregnant with our child. We were a little old to be calling each other boyfriend and girlfriend; it sounds high school. And we have talked about it.

Q. And so girlfriend and boyfriend at your age sounded preposterous, so you said what? What would you call yourself?

A. Husband and wife.

10

Q. And you talked about calling yourselves husband and wife?

A. Yes.

Q. And the rationale for calling yourselves husband and wife was basically that it sounded very high schoolish, and you're pregnant, so why should you be calling yourself boyfriend and girlfriend?

A. . . . We were going to be legally married; at the time, we couldn't.

Q. You planned to get legally married in the future and, therefore, you decided to call yourselves husband and wife now?

A. Yes.

. . . .

Q. . . . You represented to others that you were in this state, and you lived together and decided to call each other man and wife in this state?

A. Yes, sir.

. . . .

Q. . . . [Y]ou told the police you were married that night?

A. I believe so.

. . . .

Q. . . . [Y]ou didn't know that you were really common-law married until you talked to the defense attorneys in this case?

A. I perceived myself as common-law, and then I got the misunderstanding that we weren't because of signing the document before the county clerk. But I still -- he -- before we were legally, he was still my husband.

### 2. Testimony of Brooks

Q. Kama, in that interview did you refer to her as the wife or as girlfriend on several occasions?

A. Both.

Q. Both. Why both?

A. Because they were living together and they had a baby together.

Q. All right. In fact, I think at one point you referred to Chris as his wife or his girlfriend. Why did you correct yourself?

A. I'm not sure, honestly.

    . . . .

Q. . . . What was Randee Poyner Kennedy, now Kennedy, Randee Poyner and Chris Kennedy's status at that time?

A. They were girlfriend/boyfriend living together and had a child together.

Q. Had they told you they were husband and wife?

A. No.

### 3. Testimony of Gerard Gonzalez

Q. Did Mr. Kennedy represent to you and others at your business that he was married to Mrs. Kennedy?

A. Not in a -- like common-law. It was like a common-law marriage at that point in time.

Q. So he represented –

12

A. Right. That they were together, they had a baby together, they lived together.

Q. And you believed Mr. and Mrs. Kennedy to be informally married or through common-law marriage?

A. Correct.

### 4. Testimony of Kennedy

Q. At any point on that tape did you refer to her as your wife?

A. No, sir. But I did refer to her as my wife to the arresting officer.

. . . .

Q. So, sir, after you were arrested and it's apparent that your wife or your girlfriend at that time, now wife, could be a witness, all of a sudden you were able to scrape up the money to get married?

A. Well, that really never crossed my mind.

. . . .

Q. You and your wife had spoken of having a ceremonial marriage at some later point in time before any of these allegations came up, correct?

A. Yes, sir. It would -- it was actually -- we had spoke of it in a conversation that her father -- her mother and father, we had. And we had talked about marriage then to her mother and father.

Q. But in the summer of 2005, did you consider yourself already married?

A. Yes, but not legally. Not legally. We represented ourselves to others as married. If I met somebody new, you know, I represented her as my wife.

13

Q. And by legally married, perhaps you are misunderstanding the status of the law. Do you mean that you weren't ceremonially married?

A. Yes, sir. We were not ceremonially married.

. . . .

Q. Did you file joint tax returns in 2005?

A. No, sir, we didn't because we're not legally married. Therefore, it would have been fraudulent.

Q. When you get checks, when your wife got checks at that time was it in her name or in her married name?

A. There again, sir, we were not legally married, so she could not take my name.

**D. Analysis**

Under the appropriate standard of review as previously recounted, and bearing in mind that Kennedy bore the burden of proof and that the trial court could believe or disbelieve all or any part of any witness testimony, we hold that the trial court did not abuse its discretion by allowing Poyner to testify.

Even if the admission of her testimony were error, it was undoubtedly harmless. *See* TEX. R. APP. P. 44.2(b). We review nonconstitutional error to determine whether it affected a substantial right. *See id*. A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct.

14

1239, 1253 (1946)); *Coggeshall,* 961 S.W.2d at 643.  In making this determination, we review the record as a whole.  *See Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

First, it should be noted that, during her testimony, Poyner repeatedly denied that Kennedy participated in the drug transaction.  But there was other competent evidence supporting Kennedy's participation, including testimony that (1) Ochoa asked Brooks to call Kennedy and ask him if he could get Ochoa a "pound of ice," (2) Kennedy asked Brooks and Poyner to stop by his house and pick up a safe and a gun before meeting him at Ochoa's home, (3) Ochoa and Kennedy decided that Kennedy would follow Ochoa and Brooks to the Kroger parking lot with the methamphetamine, (4) Detective Cook saw Kennedy's car in the Kroger parking lot when the drug deal occurred, (5) Ochoa told Detective Cook that he had to get the methamphetamine from a friend, (6) Ochoa walked from the detective's car to Kennedy's car, returned to the detective's car and pulled the methamphetamine out of his pants, (7) the drug that Ochoa gave to the detective was 444 grams of methamphetamine, and (8) Kennedy fled when the police busted the drug transaction.

We conclude that, in the context of the entire case against Kennedy, the trial court's error, if any, in admitting Poyner's testimony did not have a substantial or injurious effect on the jury's verdict and did not affect Kennedy's

15

substantial rights. *See* TEX. R. APP. P. 44.2(b); *King*, 953 S.W.2d at 271. We overrule Kennedy's second point.

## VI. The Videotape

In his third point, Kennedy asserts that the trial court erred by admitting a videotape of Poyner's interrogation by police.

### A. Background

During her testimony at trial, Poyner denied that she and Kennedy appeared at the Kroger parking lot to conduct a drug deal. However, she also testified that she had told the arresting officers on videotape just the opposite—that she and Kennedy did appear at the Kroger parking lot to conduct a drug deal. Her explanation for the discrepancy was that she was told what to say during her videotaped interrogation by the narcotics officers, who threatened to send her to jail and her daughter to CPS if she refused. In other words, it was Poyner's testimony at trial that she was not telling the truth during the interrogation, when she admitted she and Kennedy were together for

a drug deal, because of police coercion.[3]  The State then offered the videotape

into evidence, asserting that it would allow the jury to

> evaluate the credibility the witness on the tape and judge for themselves if she is telling the truth now or she was telling the truth then.  She has unequivocally told the jury that she is denying that they would see that on the tape and that it is truthful. . . . It's not being offered for the truth of the matter asserted.  It's also contextual circumstantial in the sense that she has now told the jury it is a scripted kind of event.  And if you watch that tape, . . . you can tell that she is volunteering information on the fly.  They couldn't possibly have been scripted.[4]

---

[3] Prosecutor to Poyner:

Q.  You are telling this jury that if they were to see that videotape they would not see somebody telling the truth on the videotape?

A.  Yes, sir.

. . . .

Q.  They would not see somebody answering questions on the fly rather than reading from a script or acting?

A.  Yes, sir.

[4] The State's counsel also observed that Kennedy's attorney was "really asking the court to have me . . . eat the horse twice."  A thorough search of the Texas Rules of Evidence and Texas Rules of Civil Procedure has failed to divine the evidentiary or procedural rule to which this statement refers, but if accurate, it seems validly objectionable, horsemeat not being commonly known as a delicacy.

Counsel for Kennedy objected that the offer constituted hearsay, was improper impeachment, and was more prejudicial than probative.[5]  The trial court admitted the videotape and instructed the jury before viewing it that "the tape was not offered for the truth of the matter asserted."

**B.  Analysis**

We have previously observed that the admission of evidence is reviewed under an abuse of discretion standard.  *See Green*, 934 S.W.2d at 101-02.

It is axiomatic that hearsay is inadmissible "except as provided by statute or these rules or by other rules prescribed pursuant to statutory authority." TEX. R. EVID. 802.  "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  TEX. R. EVID. 801(d).  Kennedy complains that the State failed to point out any exception to the hearsay rule allowing admission of the videotape.  However, the State asserts that the tape was not hearsay at all and was introduced to "rebut Poyner's claims that the police threatened and coerced her into falsely stating that [Kennedy] was at the parking lot in order

---

[5] It is noted that counsel for Kennedy referred to Randee as "Ms. Poyner."

18

to conduct the drug deal."[6] In other words, the videotape was not offered for the truth of the matter asserted—that is, whether she and Kennedy were in the parking lot to do a drug deal—but rather to rebut the alleged police coercion. We agree. The statements in the videotape were not offered for the truth of the matter asserted, as instructed by the trial court, and therefore did not constitute hearsay.

## C. Improper Impeachment

Kennedy also argues that the videotape was inadmissible as improper impeachment, focusing on that portion of rule 613(a) entitled "Examining Witness Concerning Prior Inconsistent Statement," which reads, "If the witness unequivocally admits having made such statement, extrinsic evidence of same shall not be admitted." TEX. R. EVID. 613(a). We have previously held that the videotape statement was admitted into evidence to rebut the allegations of police misconduct through coercion, and not whether Poyner and Kennedy were in the Kroger parking lot for a drug deal. It is this latter assertion regarding the drug deal that Poyner admitted telling the police about previously, and there

---

[6] The court has reviewed the videotape. It is clear from the videotape that Poyner's statements were unscripted and uncoerced: she explained to the two officers, while holding her baby, that this was the "first time" and that Kennedy only did it as a favor for Ochoa, to help Brooks, and because she and Kennedy were behind on their bills and needed the money to make a car payment. One of the officers asked if she had family that could come and get her and the baby; she said, "no," and started crying.

19

were no admissions by Poyner about absence of police coercion. Therefore this argument is without merit.

**D. Rule 403 Objection**

Kennedy also made a rule 403 objection. Rule 403 of the Texas Rules of Evidence reads as follows: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." TEX. R. EVID. 403.

Once Kennedy made the objection, the trial court had to weigh the probativeness of the evidence to determine if it was substantially outweighed by its potential for unfair prejudice. *Santellan v. State*, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997). A rule 403 balancing test includes the following factors: (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 & n.8 (Tex. Crim. App. 2006).

The rules of evidence favor the admission of relevant evidence and carry a presumption that relevant evidence is more probative than prejudicial. *Jones v. State*, 944 S.W.2d 642, 652 (Tex. Crim. App. 1996). When determining whether evidence is admissible under rule 403, we do not consider just whether the evidence is more prejudicial than probative; we consider whether the probative value is *substantially* outweighed by the danger of unfair prejudice. *Garcia v. State*, 201 S.W.3d 695, 704 (Tex. Crim. App. 2006). Our highest criminal court has observed that we will only reverse the trial court's judgment under rule 403 "rarely and only after a clear abuse of discretion." *Mozon v. State*, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999). And this is as it should be. It is the trial judge, in the midst of the trial itself, who is in the best position to weigh the probative versus prejudicial value of evidence on Themis's scales of justice. *See id.*

Turning to the relevant factors of those previously enumerated, it was incumbent upon the State to attempt to rebut the allegations of police misconduct through coercion because, immediately before and after the six-minute videotape was played, Poyner testified that everything she said on the videotape was coerced and scripted. The trial court negated any tendency of the evidence to suggest to the jury that Kennedy was guilty, or to distract the jury from the coercion issue, by instructing the jury that it was not to consider

the videotape for the truth of the matters asserted therein. And, we generally presume that the jury follows the trial court's instructions, including a limiting instruction regarding certain testimony. *Adams v. State*, 179 S.W.3d 161, 165 (Tex. App.—Amarillo 2005, no pet.). Therefore, under the appropriate standard of review, the trial judge's decision was outside the zone of disagreement. We hold that the Rule 403 objection was properly overruled by the trial court.

### E. Harmless Error

Regardless of the foregoing arguments regarding the admissibility of the videotape, even assuming error, it would also be harmless.

We agree with the parties that any error is of a nonconstitutional dimension. That said, as previously discussed above, any error would have to affect substantial rights of the accused to be reversible. TEX. R. APP. P. 44.2(b). We have fair assurance that the judgment was not substantially swayed by the error. *See Garcia v. State*, 126 S.W.3d 921, 927 n.9 (Tex. Crim. App. 2004). As pointed out by the State, other evidence of Kennedy's culpability included at least that (1) Ochoa asked Brooks to call Kennedy and ask him if he could get Ochoa a "pound of ice"; (2) Kennedy asked Brooks and Poyner to stop by his house and pick up a safe and a gun before meeting him at Ochoa's home; (3) Ochoa and Kennedy decided that Kennedy would follow

22

Ochoa and Brooks to the Kroger parking lot with the methamphetamine; (4) Detective Cook saw Kennedy's car in the Kroger parking lot when the drug deal occurred; (5) Ochoa told Detective Cook that he had to get the methamphetamine from a friend; (6) Ochoa walked from the detective's car to Kennedy's car, returned to the detective's car and pulled the methamphetamine out of his pants; (7) the chemist testified that the drug that Ochoa gave to the detective was 444 grams of methamphetamine; and (8) Kennedy fled when the police busted the drug transaction.

We conclude that, in the context of the entire case against Kennedy, the trial court's error, if any, in admitting the videotape, did not have a substantial or injurious effect on the jury's verdict and did not affect Kennedy's substantial rights. *See King*, 953 S.W.2d at 271. Thus, we disregard the error. *See* TEX. R. APP. P. 44.2(b). Kennedy's point number three is overruled.

## VII. Accomplice Witness Testimony

In his fourth point, Kennedy asserts that the accomplice witness testimony, that of Brooks, was not sufficiently corroborated to support the conviction.

### A. The Rule and the Law

Article 38.14 of the Texas Code of Criminal Procedure (the "Rule") states
A conviction cannot be had upon the testimony of an accomplice
unless corroborated by other evidence tending to connect the

23

defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.

TEX. CODE CRIM. PROC. ANN. 38.14 (Vernon 2005).

An accomplice is one who participates with the defendant before, during, or after the commission of a crime by doing some affirmative act promoting the commission of that offense and who could be prosecuted for the same offense, or a lesser included offense, as the defendant. *Blake v. State*, 971 S.W.2d 451, 454-55 (Tex. Crim. App. 1998). When conducting our sufficiency review regarding the Rule, we are required to eliminate Brooks's testimony from consideration and review the remaining record to see if there is evidence that tends to connect Kennedy with the commission of the crimes alleged herein. *See Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001). This evidence does not need to be strong enough to establish Kennedy's guilt beyond a reasonable doubt and need not directly link him to the commission of the alleged crimes. *Id.; see also Hernandez v. State*, 939 S.W.2d 173, 176-79 (Tex. Crim. App. 1997) (demonstrating the application of this rule).

### B. Analysis

Once more recounting the evidence tending to show Kennedy's guilt, but without considering Brooks's testimony, the following evidence was presented at trial. Cook testified that he had arranged a drug buy with Ochoa and that they met in a Kroger parking lot off of I-20, that Ochoa told him that the drugs

24

were with his friends, that he then watched Ochoa get into a white Ford Expedition, and that Ochoa immediately returned and transferred to Cook a pound of methamphetamine. He also testified that the Expedition left the scene quickly. Jim West, the Grand Prairie patrol officer who stopped the Expedition not far from the scene, on an I-20 service road, testified that the Arlington Police Department, Narcotics, had requested their assistance in chasing down the Expedition. He also testified that the Expedition contained a male driver, a female passenger, and a baby.

Poyner testified that she, Kennedy, and their baby were in the Kroger parking lot at 10:30 p.m. that night in a white Ford Expedition, that Kennedy was the driver, and that Ochoa and Brooks were also there, in a different vehicle. She testified that she and Kennedy did not go out there that night to do a drug deal, that they did not know about a drug deal until Ochoa got into the Expedition, that they left, that they were stopped by the police on I-20, and that Kennedy was innocent. The senior forensic chemist testified that the substance submitted to her by the Arlington Police Department corresponding to this case was 444 grams of methamphetamine.

After considering the evidence without Brooks's testimony, and given the jury's role in resolving conflicts in the testimony, including witness credibility, we hold that, even without Brooks's testimony, there is sufficient corroborating evidence tending to connect Kennedy to the commission of the crime. *See*

25

*Solomon*, 49 S.W.3d at 361; *Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000); *Hernandez*, 939 S.W.2d at 176-79.  We overrule Kennedy's fourth point.

### VIII.  Conclusion

Having overruled Kennedy's last three points, we affirm the trial court's judgment as to his conviction and sentence for delivery of four hundred grams or more of methamphetamine.  But having sustained Kennedy's first point, we vacate his conviction for possession and intent to deliver methamphetamine of four hundred grams or more.  *See Lopez*, 80 S.W.3d at 627–29, 630–31.


PER CURIAM

PANEL F:    MCCOY, J.; CAYCE, C.J.; and LIVINGSTON, J.

LIVINGSTON, J. concurs without opinion.

DO NOT PUBLISH
TEX. R. APP. P. 47.2(b)

DELIVERED: June 19, 2008

26